Christopher Duran (CA SBN 110899)
*cduran@chirla.org*
COALITION FOR HUMANE IMMIGRANT RIGHTS (CHIRLA)
2533 W 3rd St, Ste 101
Los Angeles, CA 90057
Telephone: 626-554-6303
Facsimilie: 213-352-1344

*Attorney for Petitioner*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| Edgar Giovanny MANOBANDA AROCA,<br><br>Petitioner-Plaintiff,<br><br>v.<br><br>Fereti SEMAIA, Warden, Adelanto ICE Processing Center; Ernesto SANTACRUZ JR., Los Angeles Field Office Director, Immigration and Customs Enforcement, Enforcement and Removal Operations; David J. VENTURELLA, Senior Official, Immigration and Customs Enforcement; Markwayne MULLIN, Secretary, U.S. Department of Homeland Security; Todd BLANCHE, U.S. Attorney General,<br><br>Respondents-Defendants. | A 246-148-558<br><br>Case No. 5:26-cv-5107<br><br>**VERIFIED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## I. INTRODUCTION

1. Petitioner Edgar Giovanny Manobanda Aroca ("E.G.M.A." or "Petitioner") respectfully petitions this Court for a writ of habeas corpus and declaratory and injunctive relief to prevent the Department of Homeland Security ("DHS") and Immigration and Customs Enforcement ("ICE") from continuing to detain him at the Adelanto ICE Processing Center without first providing him a due process hearing before a neutral adjudicator.

2. E.G.M.A. has been detained since August 27, 2026, when ICE officers arrested him at his ICE check-in at 300 N Los Angeles St, Los Angeles, CA 90012, without advance notice, without cause, and without providing any hearing to determine whether he poses a danger or a flight risk, as required by the Fifth Amendment.

3. E.G.M.A. was previously released under conditional humanitarian parole on October 17, 2022, after being detained for one day in El Paso, TX [Exhibit A, Form I-385 and Parole Stamp]. He complied fully with all ICE reporting instructions and is a derivative on his wife's pending asylum application and maintains a valid work permit. He has also maintained a stable residence in Long Beach and notified ICE of any change of residence. He built significant community and family ties and has stable full-time employment. No change in circumstances justified ICE's abrupt decision to revoke his liberty and place him back into immigration detention.

4. The arrest and detention of individuals like E.G.M.A. – who have complied with every instruction given by DHS – are part of a new pattern in which ICE is re-detaining parolees without notice and without a hearing, using detention punitively to strip individuals of their procedural rights, force them to forfeit applications for relief, and pressure them into fast-track removal. Because E.G.M.A. has a pending removal case under INA § 240, his detention is governed by 8 U.S.C. § 1226(a). Under that framework, the Constitution requires a hearing where DHS bears the burden to prove, by clear and convincing evidence, that he is a danger or

flight risk. *Hernandez v. Sessions*, 872 F.3d 976 (9th Cir. 2017); *Singh v. Holder*, 638 F.3d 1196 (9th Cir. 2011).

5. Furthermore, a bond hearing before an IJ is an inadequate remedy because it is unlikely to be a fair one. One principal concern is that IJs often cite little or no reasoning in determining that noncitizens are a flight-risk. The mounting evidence that bond determination hearings conducted in Immigration Court under § 1226(a) have preordained outcomes has become impossible to ignore. As a result, courts across the country have, with increasing frequency, ceased "order[ing] even initial bond hearings in cases like this one involving unlawful detention under § 1225(b) because Respondents' conduct can no longer be attributed to mere negligence or ineptitude,...and doing so would effectively allow the Government to transform an unlawful detention into a lawful one through post-hoc justifications." Zheng, 2026 WL 800203, at *11 (collecting cases).

6. E.G.M.A. now seeks immediate release from ICE custody without more onerous supervision requirements than those he was subject to prior to his current detention, the return of all his belongings confiscated during his arrest, and an order enjoining DHS from re-detaining him in the future unless and until he is first provided notice and a hearing before a neutral adjudicator in which the Government bears the burden of proof to show by clear and convincing evidence that Petitioner is a flight risk or a danger to the community and that no condition or combination of conditions could reasonably assure Petitioner's future appearance and/or the safety of the community.

7. E.G.M.A. is an Ecuadoran citizen who entered the United States at or near El Paso, TX on October 16, 2022. He was processed by Border Patrol and held for one day in a cold detention center where he slept on the floor with just an aluminum blanket and was only offered burritos, cereal bars, and apples to eat. E.G.M.A. was then released on October 17, 2022, under conditional humanitarian parole pursuant to INA § 212(d)(5) [Exhibit A, Form I-385 and Parole

Stamp]. ICE did not require him to post a bond. He was then brought to a shelter with his family and from there traveled to Long Beach [Exhibit B, Petitioner's Declaration]. E.G.M.A. complied with all the conditions of his release, including not committing any crimes and attending his ICE appointments. E.G.M.A. is also a derivative on his wife's asylum application [Exhibit B, Petitioner's Declaration].

8. E.G.M.A. lived in Long Beach, CA, after his arrival in the country, where he quickly integrated into the community. In early 2026, E.G.M.A. and his family moved to a different address in Long Beach to have more space: 2301 Pasadena Ave, Long Beach, CA 90806. E.G.M.A. lived at this address with his wife, two daughters, and several US Citizen family members, including his US Citizen grandchildren. E.G.M.A. remained at this address until his detention and plans to return to this address if released.

9. As a practicing Catholic, E.G.M.A. attended Catholic services in Long Beach, CA at Santa Lucia church every Sunday with his family. In Adelanto, he has been continuing to practice his faith by gathering with other detainees on Sundays and doing group prayers.

10. Shortly after arriving in the country, E.G.M.A. began working as a cleaner at a laundromat. E.G.M.A. became close with the owner, who called E.G.M.A. a great worker and a responsible person. The laundromat owner would even entrust E.G.M.A. to run the shop when he was not around. The laundromat was eventually sold to a different owner and E.G.M.A. began looking for work elsewhere. Around April of 2026, E.G.M.A. began working at Santa Monica Seafood in production. He rapidly made a strong impression on the company. Upon being detained, the company asserted that E.G.M.A. is a hard worker and that his job will be waiting for him once he is released.

11. E.G.M.A. made lasting friendships at work, especially with his friend Angelo, and he misses spending time with his team.

12. When he was not working, E.G.M.A. spent his free time taking care of his daughters and grandchildren, especially in the evenings when his wife went to work. He paid a portion of rent, helped buy necessities for the US Citizen grandchildren who are babies, supplied food for the household, and financially supported his family. As the only family member with a driver's license, E.G.M.A. would also drive members of the family wherever they needed to go.

13. E.G.M.A. has a mother in Ecuador who has osteoporosis and needs consistent medical care, including appointments and medication. E.G.M.A. would send money to help pay for her medical care and for her food. Now that E.G.M.A. is detained, his sick mother is struggling without his financial support, unable to pay for appointments, medication, and food.

14. E.G.M.A. is a derivative of his wife's asylum application filed with USCIS based on persecution E.G.M.A. and his family suffered harm from gang members in retaliation for E.G.M.A.'s resistance to robbery and for reporting the crime to the police. E.G.M.A. was a bus driver in Ecuador who was robbed at gunpoint by gang members while working. Due to resisting the robbers and due to the crime being reported to the police, he and his family began receiving death threats from gang members. The police were unable to assist, and E.G.M.A. and his family were forced to flee Ecuador to avoid being killed. If returned to Ecuador, E.G.M.A. fears being killed by gang members as they threatened to kill him and his family due to his having resisted robbery and for reporting the crime to the police. E.G.M.A. is eager to have his asylum claim argued in immigration court.

15. E.G.M.A. has no criminal history [Exhibit B, Petitioner's Declaration].

16. On the morning of August 27, 2026, in compliance with instructions from ICE, E.G.M.A. presented himself for a scheduled check-in with ICE at 300 N Los Angeles St, Los Angeles, CA 90012. E.G.M.A. arrived at the facility at approximately 7:45 a.m. for his 8 a.m. appointment. He was eventually let in and sent to floor 7, where he was given a paper to take to the basement

of the building. E.G.M.A. went to the basement where an officer took his California driver license, work permit, social security card, and Ecuador passport. E.G.M.A. was told by officers to sign Voluntary Departure, but Edgar refused and said he wanted to continue his immigration case. After he refused, the officers told him he was being detained.

17. Officers arrested E.G.M.A., who did not resist in any manner. Agents never told Edgar why he was being detained. E.G.M.A. immediately complied with the officers' commands. The officers took his fingerprints, a photo, and performed a DNA saliva test. E.G.M.A. was held in a room in Los Angeles into the middle of the night until he was put in a van for Adelanto. Before placing him in the van to Adelanto, officers placed E.G.M.A. in handcuffs and shackled his feet. He was further restrained with a chain around his waist, connecting his hand and foot shackles. The ride to Adelanto was uncomfortable for E.G.M.A., and he felt unsafe as officers did not put on his seat belt. He arrived at around 2:30 AM. E.G.M.A. was first taken to doctors in Adelanto who performed a medical exam. Edgar told the doctors that he had had a recent surgery and suffered from back and hip pain. He takes pain medication, but ran out, and Adelanto has not supplied him with more medicine.

18. E.G.M.A.'s abrupt detention has caused significant and ongoing harm. He has not received any medical care for his back and hip pain. He had also suffered from depression before and wants to get out of detention quickly, as he fears these feelings may return.

19. The stress of being locked in Adelanto has also worsened E.G.M.A.'s medical conditions and he does not believe Adelanto is a good place to recover. E.G.M.A. describes the detention center as an environment of constant stress and fatigue, where no one, including E.G.M.A., can sleep.

20. E.G.M.A. experiences emotional distress and constant worry about his immigration case and his continued detention. He also fears for the wellbeing of his wife, children, grandchildren,

and mother who he was financially supporting. His family and friends miss him dearly and have felt his loss. E.G.M.A. is especially concerned about being unlawfully deported to Ecuador because he will likely be persecuted by gang members for being a bus driver that resisted robbery and communicated with the police about the crime.

21. At Adelanto Detention Center, E.G.M.A. is full of nerves and feels unsafe because of all the uncertainty and because no one has given him concrete information on his detention. E.G.M.A. has to pay to call outside of detention, which has also cost him greatly.

22. E.G.M.A. is not a flight risk or danger to society. E.G.M.A. has complied with all ICE reporting requirements, has a pending asylum case and a work permit, has stable residence, has strong community and family ties, has stable employment, and has no criminal history [Exhibit B, Petitioner's Declaration].

23. By statute and regulation, as interpreted by the Board of Immigration Appeals (BIA), ICE has the authority to re-arrest a noncitizen where there has been a material change in circumstances since the individual's release. 8 U.S.C. § 1226(b); 8 C.F.R. § 236.1(c)(9); *Matter of Sugay*, 17 I&N Dec. 647, 640 (BIA 1981). The government has further clarified in litigation that any change in circumstances must be "material." *Saravia v. Barr*, 280 F. Supp. 3d 1168, 1197 (N.D. Cal. 2017), *aff'd sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018) (emphasis added). That authority, however, is proscribed by the Due Process Clause because it is well-established that individuals released from incarceration have a liberty interest in their freedom. In turn, to protect that interest, on the particular facts of E.G.M.A.'s case, due process requires notice and a hearing, *before any re-arrest*, at which he is afforded the opportunity to advance his arguments as to why his previous release status should not be revoked.

24. That basic principle – that individuals placed at liberty are entitled to process before the government imprisons them – has particular meaning here. A DHS officer previously found that

E.G.M.A. need not be incarcerated to prevent flight, or to protect the community, and no material circumstances have changed that would justify re-arrest. Therefore, at a minimum, to lawfully re-arrest E.G.M.A., the government must first establish, by clear and convincing evidence and before a neutral decision maker, that he is a danger to the community or a flight risk, such that his reincarceration is necessary. ICE's re-arrest of E.G.M.A. on August 27, 2026, violated these statutes, regulations, case law authority, and due process.

25. Petitioner respectfully seeks a writ of habeas corpus ordering the government to immediately release him from his ongoing, unlawful detention, return his belongings seized during his arrest, refrain from placing him on stricter monitoring than he had before his current detention, and prohibiting his re-arrest without a hearing to contest that re-arrest before a neutral decisionmaker in which the Government bears the burden of proof to show by clear and convincing evidence that Petitioner is a flight risk or a danger to the community and that no condition or combination of conditions could reasonably assure Petitioner's future appearance and/or the safety of the community. In addition, to preserve this Court's jurisdiction, Petitioner also requests that this Court order the government not to transfer him to another detention center outside of the District for the duration of this proceeding. Such a transfer would cause hardship to Petitioner's family, friends, and community by moving him further away from Long Beach, CA. Furthermore, it would render any decision by this Court futile if E.G.M.A. is transferred to a detention center outside of the Court's jurisdiction.

## II. CUSTODY

26. Petitioner is currently in the custody of ICE at the Adelanto ICE Processing Center in Adelanto, California. E.G.M.A. is therefore in "'custody' of [the DHS] within the meaning of the habeas corpus statute." *Jones v. Cunningham*, 371 U.S. 236, 243 (1963).

## III. JURISDICTION AND VENUE

27. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1651 (All Writs Act), 28 U.S.C. §§ 2201–02 (Declaratory Judgment Act), 28 U.S.C. § 2241 (habeas corpus), Article I, § 9, cl. 2 of the U.S. Constitution (the Suspension Clause), the Fourth and Fifth Amendments to the U.S. Constitution, and 5 U.S.C. §§ 701-706 (Administrative Procedure Act).

28. Venue is proper in this District and Division pursuant to 28 U.S.C. § 2241(a) and 28 U.S.C. § 1391(b)(2) and (e)(1) because Petitioner is physically detained within this District.

## IV. REQUIREMENTS OF 28 U.S.C. § 2243

29. The Court must grant the petition for writ of habeas corpus or issue an order to show cause (OSC) to Respondents "forthwith," unless the Petitioner is not entitled to relief. 28 U.S.C. § 2243. If an OSC is issued, the Court must require Respondents to file a return "within *three days* unless for good cause additional time, *not exceeding twenty days*, is allowed." *Id.* (emphasis added).

30. Courts have long recognized the significance of the habeas statute in protecting individuals from unlawful detention. The Great Writ has been referred to as "perhaps the most important writ known to the constitutional law of England, affording as it does a *swift* and imperative remedy in all cases of illegal restraint or confinement." *Fay v. Noia*, 372 U.S. 391, 400 (1963) (emphasis added).

31. Habeas corpus must remain a swift remedy. Importantly, "the statute itself directs courts to give petitions for habeas corpus 'special, preferential consideration to ensure expeditious hearing and determination.'" *Yong v. INS*, 208 F.3d 1116, 1120 (9th Cir. 2000) (internal citations omitted). The Ninth Circuit warned against any action creating the perception "that courts are more concerned with efficient trial management than with the vindication of constitutional rights." *Id.*

## V. EXHAUSTION OF ADMINISTRATIVE REMEDIES

32. For habeas claims, exhaustion of administrative remedies is prudential, not jurisdictional. *Hernandez*, 872 F.3d at 988. A court may waive the prudential exhaustion requirement if "administrative remedies are inadequate or not efficacious, pursuit of administrative remedies would be a futile gesture, irreparable injury will result, or the administrative proceedings would be void." *Id.* (*quoting Laing v. Ashcroft*, 370 F.3d 994, 1000 (9th Cir. 2004) (citation and quotation marks omitted)). E.G.M.A. asserts that exhaustion should be waived because administrative remedies are (1) futile and (2) his continued detention results in irreparable harm.

33. It would be futile for E.G.M.A. to seek a bond hearing from an Immigration Judge. A bond hearing before an IJ is an inadequate remedy as it is unlikely to be a fair one. IJs often cite little or no reasoning in determining that noncitizens are a flight-risk. The mounting evidence that bond determination hearings conducted in Immigration Court under § 1226(a) have preordained outcomes has become impossible to ignore. As a result, courts across the country have, with increasing frequency, ceased "order[ing] even initial bond hearings in cases like this one involving unlawful detention under § 1225(b) because Respondents' conduct can no longer be attributed to mere negligence or ineptitude,...and doing so would effectively allow the Government to transform an unlawful detention into a lawful one through post-hoc justifications." Zheng, 2026 WL 800203, at *11 (collecting cases).

34. Further, no statutory exhaustion requirements apply to E.G.M.A.'s claim of unlawful custody in violation of his due process rights, and there are no administrative remedies that he needs to exhaust. *Reno v Amer.-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) (finding exhaustion to be a "futile exercise because the agency does not have jurisdiction to review" constitutional claims); *In re Indefinite Det. Cases*, 82 F. Supp. 2d 1098, 1099 (C.D. Cal. 2000) (same).

## VI. PARTIES

35. E.G.M.A. is a citizen and national of Ecuador who entered the U.S. on October 16, 2022, and has remained in the country since. The DHS has deemed E.G.M.A. neither a danger to his community nor a flight risk and released him with parole on October 17, 2022. He established a life in Long Beach, CA. He has a pending asylum application submitted and work permit. He is gainfully employed and spends his free time taking care of his family.

36. Respondent Fereti SEMAIA is sued in her official capacity as the Warden of Adelanto ICE Processing Center, where Petitioner is currently detained. Respondent Fereti SEMAIA has immediate physical custody over Petitioner pursuant to the facility's contract with ICE to detain noncitizens and is thereby a legal custodian of Petitioner.

37. Respondent Ernesto SANTA CRUZ JR. is sued in his official capacity as Field Office Director for the Los Angeles Field Office of ICE. Adelanto ICE Processing Center is located within the jurisdiction of the ICE Los Angeles Field Office, which has legal authority over all individuals in ICE custody there. As Field Office Director, Ernesto SANTA CRUZ JR. is a custodian of Petitioner with legal authority to produce and release her.

38. Respondent David J. VENTURELLA is sued in his official capacity as the Senior Official of ICE, a component agency of DHS. ICE is responsible for enforcing U.S. immigration laws, including detention of alleged noncitizens in removal proceedings, which the agency chooses to accomplish through imprisonment and removal of noncitizens with final orders of removal. As ICE's Senior Official, Respondent David J. VENTURELLA is a custodian of Petitioner, with legal authority to produce and release her.

39. Respondent Markwayne MULLIN is sued in his official capacity as the Secretary of DHS. He is responsible for overseeing DHS and its sub-agency, ICE, and has ultimate responsibility over

detention of alleged noncitizens in civil immigration custody, including Petitioner. Respondent Markwayne MULLIN is a legal custodian of Petitioner.

40. Respondent Todd BLANCHE is sued in his official capacity as Attorney General of the United States. He is responsible for overseeing the Department of Justice (DOJ), and thereby the Executive Office for Immigration Review (EOIR) and the Immigration Court system it operates.

## VII. STATEMENT OF FACTS

41. Since mid-May 2025, DHS has initiated an aggressive new enforcement campaign targeting people who are in regular removal proceedings in Immigration Court, many of whom have pending applications for asylum or other relief. This "coordinated operation" is "aimed at dramatically accelerating deportations" by arresting people at courthouses or at ICE offices and placing them into expedited removal.[1] The Trump administration implemented a policy to drastically increase immigration arrests to a target of at least 3,000 per day. According to White House officials like Stephen Miller, this directive prioritized arrest numbers over the individuals' criminal history, encouraging agents to conduct mass roundups in public spaces rather than targeted investigations.

42. As a result, arrests of non-citizens with no criminal record surged by over 800%, and two-thirds of those deported had no criminal history. This focus on quantity over public safety led to a new and aggressive tactic: systematically arresting immigrants at courthouses and ICE appointments, regardless of the status of their legal cases. This has created a climate of fear, discouraging people from attending their mandatory hearings or ICE appointments.

43. In addition, individuals are now held for extended periods, sometimes days, in temporary

[1] Arelis R. Hernández & Maria Sacchetti, *Immigrant Arrests at Courthouses Signal New Tactic in Trump's Deportation Push*, Wash. Post, May 23, 2025, https://www.washingtonpost.com/immigration/2025/05/23/immigration-court-arrests-ice-trump/; *see also* Hamed Aleaziz, Luis Ferré-Sadurní, & Miriam Jordan, *How ICE is Seeking to Ramp Up Deportations Through Courthouse Arrests*, N.Y. Times, May 30, 2025, https://www.nytimes.com/2025/05/30/us/politics/ice-courthouse-arrests.html.

holding cells that are not designed for overnight or prolonged detention, often under inhumane conditions. Government officials have justified these harsh conditions not as a matter of necessity, but as an intentional deterrent, which is not a constitutionally permissible reason for detention.

44. The government's new campaign is also a significant shift from the previous DHS practice of re-detaining noncitizens like E.G.M.A. only after a material change in circumstances. *See Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1197 (N.D. Cal. 2017), *aff'd sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018) (describing prior practice).

45. E.G.M.A. is an Ecuadoran citizen who entered the United States at or near El Paso, TX on October 16, 2022. He was processed by Border Patrol and held for one day in a cold detention center where he slept on the floor with just an aluminum blanket and was only offered burritos, cereal bars, and apples to eat. E.G.M.A. was then released on October 17, 2022, under conditional humanitarian parole pursuant to INA § 212(d)(5) [Exhibit A, Form I-385 and Parole Stamp]. ICE did not require him to post a bond. He was then brought to a shelter with his family and from there traveled to Long Beach [Exhibit B, Petitioner's Declaration]. E.G.M.A. complied with all the conditions of his release, including not committing any crimes and attending his ICE appointments, and is also a derivative on his wife's asylum application [Exhibit B, Petitioner's Declaration].

46. E.G.M.A. lived in Long Beach, CA, after his arrival in the country, where he quickly integrated into the community. In early 2026, E.G.M.A. and his family moved to a different address in Long Beach to have more space: 2301 Pasadena Ave, Long Beach, CA 90806. E.G.M.A. lived at this address with his wife, two daughters, and several US Citizen family members, including his US Citizen grandchildren. E.G.M.A. remained at this address until his detention and plans to return to this address if released.

47. As a practicing Catholic, E.G.M.A. attended Catholic services in Long Beach, CA at Santa Lucia church every Sunday with his family. In Adelanto, he has been continuing to practice his faith by gathering with other detainees on Sundays and doing group prayers.

48. Shortly after arriving in the country, E.G.M.A. began working as a cleaner at a laundromat. E.G.M.A. became close with the owner, who called E.G.M.A. a great worker and a responsible person. The laundromat owner would even entrust E.G.M.A. to run the shop when he was not around. The laundromat was eventually sold to a different owner and E.G.M.A. began looking for work elsewhere. Around April of 2026, E.G.M.A. began working at Santa Monica Seafood in production. He rapidly made a strong impression on the company. Upon being detained, the company asserted that E.G.M.A. is a hard worker and that his job will be waiting for him once he is released.

49. E.G.M.A. made lasting friendships at work, especially with his friend Angelo, and he misses spending time with his team.

50. When he was not working, E.G.M.A. spent his free time taking care of his daughters and grandchildren, especially in the evenings when his wife went to work. He paid a portion of rent, helped buy necessities for the US Citizen grandchildren who are babies, supplied food for the household, and financially supported his family. As the only family member with a driver's license, E.G.M.A. would also drive members of the family wherever they needed to go.

51. E.G.M.A. has a mother in Ecuador who has osteoporosis and needs consistent medical care, including appointments and medication. E.G.M.A. would send money to help pay for her medical care and for her food. Now that E.G.M.A. is detained, his sick mother is struggling without his financial support, unable to pay for appointments, medication, and food.

52. E.G.M.A. is a derivative of his wife's asylum application filed with USCIS based on persecution E.G.M.A. and his family suffered from gang members in retaliation to E.G.M.A.

resisting robbery and for reporting the crime to the police. E.G.M.A. was a bus driver in Ecuador who was robbed at gunpoint by gang members while working. Due to resisting the robbers and due to the crime being reported to the police, he, and his family his family began receiving death threats from gang members. The police were unable to assist and E.G.M.A. and his family were forced to flee Ecuador to avoid being killed. If returned to Ecuador, E.G.M.A. fears being killed by gang members as they threatened to kill him and his family for him having resisted arrest and for the crime having been reported to police. E.G.M.A. is eager to have his asylum claim argued in immigration court.

53. E.G.M.A. has no criminal history [Exhibit B, Petitioner's Declaration].

54. On the morning of August 27, 2026, in compliance with instructions from ICE, E.G.M.A. presented himself for a scheduled check-in with ICE at 300 N Los Angeles St, Los Angeles, CA 90012. E.G.M.A. arrived at the facility at approximately 7:45 a.m. for his 8 a.m. appointment. He was eventually let in and sent to floor 7, where he was given a paper to take to the basement of the building. E.G.M.A. went to the basement where an officer took his California driver license, work permit, social security card, and Ecuador passport. E.G.M.A. was told by officers to sign Voluntary Departure, but Edgar refused and said he wanted to continue his immigration case. After he refused, the officers told him he was being detained.

55. Officers arrested E.G.M.A., who did not resist in any manner. Agents never told Edgar why he was being detained. E.G.M.A. immediately complied with the officers' commands. The officers took his fingerprints, a photo, and performed a DNA saliva test. E.G.M.A. was held in a room in Los Angeles into the middle of the night until he was put in a van for Adelanto. Before placing him in the van to Adelanto, officers placed E.G.M.A. in handcuffs and shackled his feet. He was further restrained with a chain around his waist, connecting his hand and foot shackles. The ride to Adelanto was uncomfortable for E.G.M.A., and he felt unsafe as officers did not put

on his seat belt. He arrived at around 2:30 AM. E.G.M.A. was first taken to doctors in Adelanto who performed a medical exam. He told the doctors that he had a recent surgery and continued to suffer from back and hip pain. He takes pain medication, but ran out, and Adelanto has not supplied him with more medicine.

56. E.G.M.A.'s abrupt detention has caused significant and ongoing harm. He has not received any medical care for his back and hip pain. He has also suffered from depression before and wants to get out of detention quickly, as he fears these feelings may return.

57. The stress of being locked in Adelanto has also worsened E.G.M.A.'s medical conditions and he does not believe Adelanto is a good place to recover. E.G.M.A. describes the detention center as an environment of constant stress and fatigue, where no one, including E.G.M.A., can sleep.

58. E.G.M.A. experiences emotional distress and constant worry about his immigration case and his continued detention. He also fears for his wife's well-being, as well as that of his children, grandchildren, and mother who he was financially supporting. His family and friends miss him dearly and have felt his loss. E.G.M.A. is especially concerned about being unlawfully deported to Ecuador because he will likely be persecuted by gang members for being a bus driver that resisted robbery and communicated with the police about the crime.

59. At Adelanto Detention Center, E.G.M.A. is full of nerves and feels unsafe because of all the uncertainty and because no one has given him concrete information on his detention. E.G.M.A. has to pay to call outside of detention, which has also cost him greatly.

60. E.G.M.A. is not a flight risk or danger to society. E.G.M.A. has complied with all ICE reporting requirements, has a pending asylum case, a valid work permit, has stable residence, has strong community and family ties, has stable employment, and has no criminal history [Exhibit B, Petitioner's Declaration].

61. Before re-detaining E.G.M.A., he must receive a hearing before a neutral adjudicator to decide whether a material change in circumstances indicates that he is now a flight risk or danger to the community. 8 C.F.R. § 236.1(c)(9). ICE did not afford E.G.M.A. a hearing, nor were there any material changes to warrant re-detention.

62. Intervention from this Court is therefore required to ensure that (1) E.G.M.A. is immediately released to return to his home in Long Beach, CA; (2) ICE returns his belongings and refrains from implementing more onerous supervision requirements than existed before his current detention; (3) ICE provides him a hearing pursuant to the Due Process Clause of the Fifth Amendment before a neutral decisionmaker in which the Government bears the burden of proof to show by clear and convincing evidence that Petitioner is a flight risk or a danger to the community and that no condition or combination of conditions could reasonably assure Petitioner's future appearance and/or the safety of the community before any further attempts to re-detain; and (4) the government refrains from transferring him to another detention center outside of the District for the duration of this proceeding.

## VIII. LEGAL BACKGROUND

**Statutory Framework**

63. E.G.M.A.'s removal proceedings before the EOIR are governed by section 240 of the Immigration and Nationality Act ("section 240 proceedings"). Section 240 proceedings provide important statutory protections, including hearings before an Immigration Judge. See 8 U.S.C. § 1229a(a)(1), (a)(4).

**Right to a Hearing Prior to Re-incarceration**

64. In E.G.M.A.'s particular circumstances, the Due Process Clause of the Constitution makes it unlawful for Respondents to re-arrest him without first providing a pre-deprivation hearing before a neutral decision maker to determine whether circumstances have materially changed

since his release from custody on October 17, 2022, such that detention would now be warranted on the basis that he is a danger or a flight risk by clear and convincing evidence.

65. The statute and regulations grant ICE the ability to unilaterally revoke any noncitizen's immigration bond determination or parole, and re-arrest the noncitizen at any time. 8 U.S.C. § 1226(b); 8 C.F.R. § 236.1(c)(9). Notwithstanding the breadth of the statutory language granting ICE the power to revoke an immigration bond "at any time," 8 U.S.C. 1226(b), in *Matter of Sugay*, 17 I&N Dec. at 640, the BIA has recognized an implicit limitation on ICE's authority to re-arrest noncitizens. There, the BIA held that "where a previous bond determination has been made by an immigration judge, no change should be made by [the DHS] absent a change of circumstance." *Id*. In practice, DHS "requires a showing of changed circumstances both where the prior bond determination was made by an immigration judge *and* where the previous release decision was made by a DHS officer." *Saravia*, 280 F. Supp. 3d at 1197 (emphasis added). The Ninth Circuit has also assumed that, under *Matter of Sugay*, ICE has no authority to re-detain an individual absent changed circumstances. *Panosyan v. Mayorkas*, 854 F. App'x 787, 788 (9th Cir. 2021) ("Thus, absent changed circumstances … ICE cannot redetain Panosyan.").

66. ICE has further limited its authority as described in *Sugay*, and "generally only re-arrests [noncitizens] pursuant to § 1226(b) after a *material* change in circumstances." *Saravia*, 280 F. Supp. 3d at 1197, *aff'd sub nom. Saravia for A.H.*, 905 F.3d 1137 (quoting Defs.' Second Supp. Br. at 1, Dkt. No. 90) (emphasis added). Thus, under BIA case law and ICE practice, ICE may re-arrest a noncitizen who had been previously released on bond only after a material change in circumstances. *See Saravia*, 280 F. Supp. 3d at 1176; *Matter of Sugay*, 17 I&N Dec. at 640.

67. ICE's power to re-arrest a noncitizen who is at liberty following a release from custody is also constrained by the demands of due process. *See Hernandez v. Sessions*, 872 F.3d 976, 981 (9th Cir. 2017) ("the government's discretion to incarcerate non-citizens is always constrained by

the requirements of due process”). *See also Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973) (Due Process requires pre-deprivation hearing before revocation of probation); *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972) (same, in parole context). Petitioner’s release from custody on October 17, 2022, and ties to his family, friends, and community provide him with a protected liberty interest. *See Ortega v. Bonnar*, 415 F. Supp. 3d 963 (N.D. Cal. Nov. 22, 2019).

68. Federal district courts in California have repeatedly recognized that the demands of due process and the limitations on DHS’s authority to revoke a noncitizen’s release from custody set out in DHS’s stated practice and *Matter of Sugay* both require a pre-deprivation hearing for a noncitizen on ICE’s supervision, like E.G.M.A., *before* ICE re-detains him. *See, e.g.*, *Meza v. Bonnar*, 2018 WL 2554572 (N.D. Cal. June 4, 2018); *Ortega v. Bonnar*, 415 F. Supp. 3d 963 (N.D. Cal. 2019); *Vargas v. Jennings*, No. 20-CV-5785-PJH, 2020 WL 5074312, at *3 (N.D. Cal. Aug. 23, 2020); *Jorge M. F. v. Wilkinson*, No. 21-CV-01434-JST, 2021 WL 783561, at *2 (N.D. Cal. Mar. 1, 2021); *Romero v. Kaiser*, No. 22-cv-02508-TSH, 2022 WL 1443250, at *3-4 (N.D. Cal. May 6, 2022) (Petitioner would suffer irreparable harm if re-detained, and required notice and a hearing before any re-detention); *Enamorado v. Kaiser*, No. 25-CV-04072-NW, 2025 WL 1382859, at *3 (N.D. Cal. May 12, 2025) (temporary injunction warranted preventing re-arrest at plaintiff’s ICE interview when he had been on bond for more than five years). *See also Doe v. Becerra*, No. 2:25-cv-00647-DJC-DMC, 2025 WL 691664, *4 (E.D. Cal. Mar. 3, 2025) (holding the Constitution requires a hearing before any re-arrest).

**E.G.M.A.’s Protected Liberty Interest in His Conditional Release**

69. The Due Process Clause protects E.G.M.A.’s liberty from immigration custody: “Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects.” *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

70. Since October 17, 2022, E.G.M.A. exercised that freedom under ICE's order releasing him from custody with conditional humanitarian parole [Exhibit A, Form I-385 and Parole Stamp]. As he was released from custody, he retains a weighty liberty interest under the Due Process Clause of the Fifth Amendment in avoiding unlawful re-incarceration. *See Young v. Harper*, 520 U.S. 143, 146-47 (1997); *Gagnon v. Scarpelli*, 411 U.S. 778, 781-82 (1973); *Morrissey*, 408 U.S. at 482-483. Respondents created a reasonable expectation that E.G.M.A. would be permitted to live and work in the United States without being subject to arbitrary arrest and removal.

71. This reasonable expectation creates constitutionally-protected liberty and property interests. *Perry v. Sindermann*, 408 U.S. 593, 601–03 (1972) (reliance on policies and practices may establish a legitimate claim of entitlement to a constitutionally-protected interest); *see also Texas v. United States*, 809 F.3d 134, 174 (2015), affirmed by an equally divided court, 136 S. Ct. 2271 (2016) (explaining that "DACA involve[s] issuing benefits" to certain applicants). These benefits are entitled to constitutional protections no matter how they may be characterized by Respondents. *See, e.g., Newman v. Sathyavaglswaran*, 287 F.3d 786, 797 (9th Cir. 2002) ("[T]he identification of property interests under constitutional law turns on the substance of the interest recognized, not the name given that interest by the state or other independent source.") (internal quotations omitted).

72. In *Morrissey*, the Supreme Court examined the "nature of the interest" that a parolee has in "[their] continued liberty." 408 U.S. at 481-82. The Court noted that, "subject to the conditions of [their] parole, [a parolee] can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life." *Id.* at 482. The Court further noted that "the parolee has relied on at least an implicit promise that parole will be revoked only if [they] fail to live up to the parole conditions." *Id.* The Court explained that "the liberty of a

parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a grievous loss on the parolee and often others." *Id.* In turn, "[b]y whatever name, the liberty is valuable and must be seen within the protection of the [Fifth] Amendment." *Morrissey*, 408 U.S. at 482.

73. This basic principle – that individuals have a liberty interest in their conditional release – has been reinforced by both the Supreme Court and the circuit courts on numerous occasions. *See, e.g.*, *Young v. Harper*, 520 U.S. at 152 (holding that individuals placed in a pre-parole program created to reduce prison overcrowding have a protected liberty interest requiring pre-deprivation process); *Gagnon v. Scarpelli*, 411 U.S. at 781-82 (holding that individuals released on felony probation have a protected liberty interest requiring pre-deprivation process). As the First Circuit has explained, when analyzing the issue of whether a specific conditional release rises to the level of a protected liberty interest, "[c]ourts have resolved the issue by comparing the specific conditional release in the case before them with the liberty interest in parole as characterized by *Morrissey*." *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 887 (1st Cir. 2010) (internal quotation marks and citation omitted). *See also*, *e.g.*, *Hurd v. District of Columbia*, 864 F.3d 671, 683 (D.C. Cir. 2017) ("a person who is in fact free of physical confinement—even if that freedom is lawfully revocable—has a liberty interest that entitles [them] to constitutional due process before [they] are re-incarcerated") (citing *Young*, 520 U.S. at 152, *Gagnon*, 411 U.S. at 782, and *Morrissey*, 408 U.S. at 482).

74. In fact, it is well-established that an individual maintains a protectable liberty interest even where the individual obtains liberty through a mistake of law or fact. *See id.*; *Gonzalez-Fuentes*, 607 F.3d at 887; *Johnson v. Williford*, 682 F.2d 868, 873 (9th Cir. 1982) (noting that due process considerations support the notion that an inmate released on parole by mistake, because he was serving a sentence that did not carry a possibility of parole, could not be re-incarcerated because

the mistaken release was not his fault, and he had appropriately adjusted to society, so it "would be inconsistent with fundamental principles of liberty and justice" to return him to prison) (internal quotation marks and citation omitted).

75. Here, when this Court "'compar[es] the specific release in [E.G.M.A.'s case], with the liberty interest in parole as characterized by *Morrissey*,'" it is clear that they are strikingly similar. *See Gonzalez-Fuentes*, 607 F.3d at 887. Just as in *Morrissey*, E.G.M.A.'s release "enables [him] to do a wide range of things open to persons'" who have never been in custody or convicted of any crime, including to live at home, care for his family and community, and "be with family and friends and to form the other enduring attachments of normal life." *Morrissey*, 408 U.S. at 482.

**E.G.M.A.'s Liberty Interest Mandates a Hearing Before any Re-Arrest and Revocation of Release from Custody**

76. E.G.M.A. asserts that, here, (1) where his detention would be civil; (2) where he has been at liberty for over three years; (3) where no change in circumstances exist that would justify his lawful detention; and (4) where the only circumstance was ICE's move to arrest as many people as possible because of the new administration, due process mandates that he be released from his unlawful custody and receive notice and a hearing before a neutral adjudicator *prior* to any re-arrest or revocation of his custody release.

77. "Adequate, or due, process depends upon the nature of the interest affected. The more important the interest and the greater the effect of its impairment, the greater the procedural safeguards the [government] must provide to satisfy due process." *Haygood v. Younger*, 769 F.2d 1350, 1355-56 (9th Cir. 1985) (en banc) (citing *Morrissey*, 408 U.S. at 481-82). This Court must "balance [E.G.M.A.'s] liberty interest against the [government's] interest in the efficient administration of" its immigration laws in order to determine what process he is owed to ensure that ICE does not unconstitutionally deprive him of his liberty. *Id*. at 1357. Under the test set forth

in *Mathews v. Eldridge*, this Court must consider three factors in conducting its balancing test: "first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards; and finally the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." *Haygood*, 769 F.2d at 1357 (*citing Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). Several district courts have applied the Mathews factors in similar cases, and found that those in Petitioner's position, noncitizens granted the liberty of release pending removal proceedings, have due process rights. See e.g., *Calderon v. Kaiser*, No. 25-CV-06695-AMO, 2025 WL 2430609, at *3 (N.D. Cal. Aug. 22, 2025); *Ramirez Clavijo v. Kaiser,* No. 25-CV-06248-BLF, 2025 WL 2419263, at *5 (N.D. Cal. Aug. 21, 2025); *Pinchi v. Noem*, No. 5:25-CV-05632-PCP, 2025 WL 2084921, at *3 (N.D. Cal. July 24, 2025); *Hernandez Nieves v. Kaiser*, No. 25-CV-06921-LB, 2025 WL 2533110, at *4 (N.D. Cal. Sept. 3, 2025).

78. The Supreme Court "usually has held that the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (emphasis in original). Only in a "special case" where post-deprivation remedies are "the only remedies the State could be expected to provide" can post-deprivation process satisfy the requirements of due process. *Zinermon*, 494 U.S. at 985. Moreover, only where "one of the variables in the *Mathews* equation—the value of pre-deprivation safeguards—is negligible in preventing the kind of deprivation at issue" such that "the State cannot be required constitutionally to do the impossible by providing pre-deprivation process," can the government avoid providing pre-deprivation process. *Id.*

79. In this case, ICE should be required to release E.G.M.A. from his unlawful custody and provide E.G.M.A. with notice and a hearing *prior* to any re-incarceration and revocation of his

liberty. *See Morrissey*, 408 U.S. at 481-82; *Haygood*, 769 F.2d at 1355-56; *Jones*, 393 F.3d at 932; *Zinermon*, 494 U.S. at 985; *see also Youngberg v. Romeo*, 457 U.S. 307, 321-24 (1982); *Lynch v. Baxley*, 744 F.2d 1452 (11th Cir. 1984) (holding that individuals awaiting involuntary civil commitment proceedings may not constitutionally be held in jail pending the determination as to whether they can ultimately be recommitted). Under *Mathews*, "the balance weighs heavily in favor of [E.G.M.A.'s] liberty" and requires a pre-deprivation hearing before a neutral adjudicator.

**E.G.M.A.'s Private Interest in His Liberty is Profound**

80. Under *Morrissey* and its progeny, individuals conditionally released from serving a criminal sentence have a liberty interest that is "valuable." *Morrissey*, 408 U.S. at 482. In addition, the principles espoused in *Hurd* and *Johnson* – that a person who is in fact free of physical confinement, even if that freedom is lawfully revocable, has a liberty interest that entitles them to constitutional due process before they are re-incarcerated – apply with even greater force to individuals like E.G.M.A., who have been released pending civil removal proceedings, rather than parolees or probationers who are subject to incarceration as part of a sentence for a criminal conviction. Criminal parolees and probationers have a diminished liberty interest given their underlying convictions. *See, e.g.*, *U.S. v. Knights*, 534 U.S. 112, 119 (2001); *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987). Nonetheless, even in the criminal parolee context, the courts have held that the parolee cannot be re-arrested without a due process hearing in which they can raise any claims they may have regarding why their re-incarceration would be unlawful. *See Gonzalez-Fuentes,* 607 F.3d at 891-92; *Hurd*, 864 F.3d at 683. Thus, E.G.M.A. retains a truly weighty liberty interest even though he is under conditional release.

81. What is at stake in this case for E.G.M.A. is one of the most profound individual interests recognized by our legal system: whether ICE may unilaterally nullify a prior decision releasing

him from custody and to take away – without a lawful basis – his physical freedom, i.e., his "constitutionally protected interest in avoiding physical restraint." *Singh v. Holder*, 638 F.3d 1196, 1203 (9th Cir. 2011) (internal quotation omitted). "Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992). *See also Zadvydas*, 533 U.S. at 690 ("Freedom from imprisonment – from government custody, detention, or other forms of physical restraint – lies at the heart of the liberty that [the Due Process] Clause protects."); *Cooper v. Oklahoma*, 517 U.S. 348 (1996).

82. Thus, it is clear that there is a profound private interest at stake in this case, which must be weighed heavily when determining what process E.G.M.A. is owed under the Constitution. *See Mathews*, 424 U.S. at 334-35.

**The Government's Interest in Re-Incarcerating E.G.M.A. Without a Hearing is Low and the Burden on the Government to Refrain from Re-Arresting Him Unless and Until He is Provided a Hearing That Comports with Due Process is Minimal**

83. The government's interest in detaining E.G.M.A. without a due process hearing is low, and when weighed against E.G.M.A.'s significant private interest in his liberty, the scale tips sharply in favor of enjoining Respondents to release Petitioner from his unlawful custody, return his belongings, not place Petitioner under stricter supervision requirements, refrain from moving Petitioner outside of the District during the proceedings of this case, and refrain from re-arresting E.G.M.A. unless and until the government demonstrates by clear and convincing evidence that he is a flight risk or danger to the community and that no condition or combination of conditions could reasonably assure Petitioner's future appearance and/or the safety of the community. It becomes abundantly clear that the *Mathews* test favors E.G.M.A. when the Court considers that the process he seeks – notice and a hearing regarding whether he has violated any conditions of his release, and, if so, providing E.G.M.A. with a hearing before this Court (or a neutral decisionmaker) to determine whether there is clear and convincing evidence that E.G.M.A. is a

flight risk or danger to the community – would impose only a *de minimis* burden on the government, because the government routinely provides this sort of hearing to individuals like E.G.M.A.

84. As immigration detention is civil, it can have no punitive purpose. The government's only interest in holding an individual in immigration detention can be to prevent danger to the community or to ensure a noncitizen's appearance at immigration proceedings. *See Zadvydas*, 533 U.S. at 690. In this case, the government cannot plausibly assert that it has any lawful basis for detaining E.G.M.A. Petitioner has lived at liberty complying with the conditions of his release since October 17, 2022, and has never missed any immigration reporting requirement or proceeding.

85. ICE determined E.G.M.A. not to be a danger to the community or a flight risk on October 17, 2022, and he has done nothing to undermine that determination. To the contrary, he complied with the terms of his release, attended every ICE check-in, fulfilled every reporting requirement, and filed his asylum application. *See Morrissey*, 408 U.S. at 482 ("'It is not sophistic to attach greater importance to a person's justifiable reliance in maintaining [their] conditional freedom so long as [they] abide by the conditions on [their] release, than to [their] mere anticipation or hope of freedom'") (quoting *United States ex rel. Bey v. Connecticut Board of Parole*, 443 F.3d 1079, 1086 (2d Cir. 1971).

86. It is difficult to see how the government's interest in ensuring his presence at the moment of removal has materially changed since he was released on October 17, 2022, when he has appeared at every ICE appointment, never missed a reporting requirement, and filed his asylum application. The government's interest in detaining E.G.M.A. at this time is therefore low. That ICE has a new policy to make a minimum number of arrests each day under the new

administration does not constitute a material change in circumstances or increase the government's interest in detaining him.[2]

87. Moreover, the "fiscal and administrative burdens" that his immediate release and a lawful pre-detention hearing would impose is nonexistent in this case. *See Mathews*, 424 U.S. at 334-35. E.G.M.A. does not seek a unique or expensive form of process, but rather a routine hearing regarding whether his order of release should be revoked and whether he should be re-incarcerated.

88. As the Ninth Circuit noted in 2017, which remains true today, "[t]he costs to the public of immigration detention are 'staggering': $158 each day per detainee, amounting to a total daily cost of $6.5 million." *Hernandez*, 872 F.3d at 996. ICE's unlawful action of placing E.G.M.A. in custody is more of a financial burden than releasing him and providing a pre-custody hearing before any future re-arrest occurs.

89. In addition, providing E.G.M.A. with a hearing before this Court (or a neutral decisionmaker) regarding release from custody is a routine procedure that the government provides to those in immigration jails on a daily basis. At that hearing, the Court would have the opportunity to determine whether circumstances have changed sufficiently to justify his re-arrest. But there is no justifiable reason to re-incarcerate E.G.M.A. prior to such a hearing taking place. As the Supreme Court noted in *Morrissey*, even where the State has an "overwhelming interest in being able to return [a parolee] to imprisonment without the burden of a new adversary criminal trial if in fact [they have] failed to abide by the conditions of [their] parole . . . the State has no

[2] *See* "Trump officials issue quotas to ICE officers to ramp up arrests," *Washington Post* (January 26, 2025), available at: https://www.washingtonpost.com/immigration/2025/01/26/ice-arrests-raids-trump-quota/.; "Stephen Miller's Order Likely Sparked Immigration Arrests And Protests," Forbes (June 9, 2025), https://www.forbes.com/sites/stuartanderson/2025/06/09/stephen-millers-order-likely-sparked-immigration-arrests-and-protests/ ("At the end of May 2025, 'Stephen Miller, a senior White House official, told Fox News that the White House was looking for ICE to arrest 3,000 people a day, a major increase in enforcement. The agency had arrested more than 66,000 people in the first 100 days of the Trump administration, an average of about 660 arrests a day,' reported the New York Times. Arresting 3,000 people daily would surpass 1 million arrests in a calendar year.").

interest in revoking parole without some informal procedural guarantees." *Morrissey*, 408 U.S. at 483.

90. E.G.M.A. should be released from unlawful custody, returned his belongings, not placed under stricter supervision requirements, not removed from the District during these proceedings, and his re-arrest enjoined until ICE (1) moves for a pre-deprivation bond hearing before an Immigration Judge and (2) demonstrates by clear and convincing evidence that E.G.M.A. is a flight risk or danger to the community. *Hernandez*, 872 F.3d at 996.

**Without a Due Process Hearing Prior to Any Re-Arrest, the Risk of an Erroneous Deprivation of Liberty is High, and Due Process in the Form of a Constitutionally Compliant Hearing Where ICE Carries the Burden Would Decrease That Risk**

91. Releasing E.G.M.A. from unlawful custody and providing E.G.M.A. with a pre-deprivation hearing would decrease the risk of E.G.M.A. being erroneously deprived of his liberty. Before E.G.M.A. can be lawfully detained, he should be provided with a hearing before a neutral adjudicator at which the government is held to show that there has been sufficiently changed circumstances such that ICE's October 17, 2022, release from custody determination should be altered or revoked because clear and convincing evidence exists to establish that E.G.M.A. is a danger to the community or a flight risk and that no condition or combination of conditions could reasonably assure Petitioner's future appearance and/or the safety of the community.

92. On August 27, 2026, E.G.M.A. did not receive this protection. Instead, he was detained by ICE at his check-in appointment, without notice, when there have been no material changes in his circumstances.

93. By contrast, the procedure E.G.M.A. seeks – a hearing in front of a neutral adjudicator at which the government must prove by clear and convincing evidence that circumstances have changed to justify his detention *before* any re-arrest – is much more likely to produce accurate

determinations regarding factual disputes, such as whether a particular occurrence constitutes a "changed circumstance." *See Chalkboard, Inc. v. Brandt*, 902 F.2d 1375, 1381 (9th Cir. 1989) (when "delicate judgments depending on credibility of witnesses and assessment of conditions not subject to measurement" are at issue, the "risk of error is considerable when just determinations are made after hearing only one side"). "A neutral judge is one of the most basic due process protections." *Castro-Cortez v. INS*, 239 F.3d 1037, 1049 (9th Cir. 2001), *abrogated on other grounds by Fernandez-Vargas v. Gonzales*, 548 U.S. 30 (2006). The Ninth Circuit has noted that the risk of an erroneous deprivation of liberty under *Mathews* can be decreased where a neutral decisionmaker, rather than ICE alone, makes custody determinations. *Diouf v. Napolitano* ("*Diouf II*"), 634 F.3d 1081, 1091-92 (9th Cir. 2011).

94. Due process also requires consideration of alternatives to detention at any custody determination hearing that may occur. The primary purpose of immigration detention is to ensure a noncitizen's appearance during removal proceedings. *Zadvydas*, 533 U.S. at 697. Detention is not reasonably related to this purpose if there are alternatives to detention that could mitigate risk of flight. *See Bell v. Wolfish*, 441 U.S. 520, 538 (1979). Accordingly, alternatives to detention must be considered in any future determination of whether E.G.M.A.'s reincarceration is warranted.

## IX. FIRST CAUSE OF ACTION

**Procedural Due Process**

**U.S. Const. amend. V**

95. E.G.M.A. re-alleges and incorporates herein by reference, as is fully set forth herein, the allegations in all the preceding paragraphs.

96. The Due Process Clause of the Fifth Amendment forbids the government from depriving any "person" of liberty "without due process of law." U.S. Const. amend. V.

97. E.G.M.A. has a vested liberty interest in his lawful conditional release. Due Process does not permit the government to strip him of that liberty without a hearing before this Court. *See Morrissey*, 408 U.S. at 487-488.

98. The Court should therefore order the government to release Petitioner from his current unlawful custody, return his belongings that were seized at his August of 2026 arrest, and refrain from implementing more onerous supervision requirements than were in place before his current detention. The Court should also order the government not to transfer E.G.M.A. to a detention center outside of the District during the proceedings of this case.

99. Prior to any re-arrest, the government must provide E.G.M.A. with a hearing before a neutral adjudicator. At the hearing, the neutral adjudicator would evaluate, *inter alia,* whether clear and convincing evidence demonstrates, taking into consideration alternatives to detention, that E.G.M.A. is a danger to the community or a flight risk and that no condition or combination of conditions could reasonably assure Petitioner's future appearance and/or the safety of the community, such that his reincarceration is warranted.

## X. SECOND CAUSE OF ACTION

**Substantive Due Process**

**U.S. Const. amend. V**

100. E.G.M.A. re-alleges and incorporates herein by reference, as is fully set forth herein, the allegations in all the preceding paragraphs.

101. The Due Process Clause of the Fifth Amendment forbids the government from depriving individuals of their right to be free from unjustified deprivations of liberty. U.S. Const. amend. V.

102. E.G.M.A. has a vested liberty interest in his conditional release. Due Process does not permit the government to strip him of that liberty without it being tethered to one of the two constitutional bases for civil detention: to mitigate against the risk of flight or to protect the

community from danger. Since he entered the country in October of 2022, E.G.M.A. has attended all his ICE appointments, complied with all reporting instructions, submitted his asylum application, and has no criminal record, thus demonstrating that he is neither a flight risk nor a danger. Re-arresting him now would be punitive and violate his constitutional right to be free from the unjustified deprivation of his liberty.

103. For these reasons, E.G.M.A.'s continued unlawful custody and any subsequent re-arrest without first being provided a pre-deprivation hearing would violate the Constitution.

104. E.G.M.A. therefore humbly requests that the Court order the government to release him from custody, return his belongings that were taken from him at the time of his arrest, and abstain from implementing stricter monitoring requirements than Petitioner had before his arrest.

105. E.G.M.A. also requests that the Court order the government not to transfer him to another detention facility outside of the District during these proceedings, and to not re-arrest him in any subsequent action without a hearing before a neutral adjudicator. At the hearing, the neutral adjudicator would evaluate, *inter alia,* whether clear and convincing evidence demonstrates, taking into consideration alternatives to detention, that E.G.M.A. is a danger to the community or a flight risk and that no condition or combination of conditions could reasonably assure Petitioner's future appearance and/or the safety of the community, such that his reincarceration is warranted.

## **XI. PRAYER FOR RELIEF**

WHEREFORE, E.G.M.A. prays that this Court grant the following relief:

(1) Assume jurisdiction over this matter;

(2) Declare that ICE's August 27, 2026, apprehension and detention of E.G.M.A. was an unlawful exercise of authority because the ICE officer provided no real reason that he presents a danger to the community or is a flight risk;

(3) Order ICE to immediately release E.G.M.A. from his unlawful detention;

(4) Order ICE to return E.G.M.A.'s belongings that were taken from him at the time of his unlawful arrest;

(5) Enjoin ICE from establishing more onerous supervision requirements than E.G.M.A. had before his current detention;

(6) Order DHS to not transfer E.G.M.A. to another detention center out of this District during the remainder of these proceedings;

(7) Enjoin DHS from re-arresting E.G.M.A. unless and until a hearing can be held before a neutral adjudicator to determine whether his re-incarceration would be lawful because the government has shown that he is a danger or a flight risk by clear and convincing evidence and that no condition or combination of conditions could reasonably assure Petitioner's future appearance and/or the safety of the community;

(8) Award reasonable costs and attorney's fees; and

(9) Grant such further relief as the Court deems just and proper.

Dated: September 3, 2026

Respectfully submitted,

*/s/ Christopher Duran*
Christopher Duran
Attorney for Petitioner

# EXHIBIT A

FINS #:1327739924 Subject ID:380666865 Event No:EPS2310001384

| | | |
|---|---|---|
| 1. FAMILY NAME (Capital Letters) First Name Middle Name<br>MANOBANDA-AROCA, EDGAR GIOVANNY | 2. Age<br>37 | 3. Country of Citizenship<br>ECUADOR |
| 4. Alias | 5. Date Apprehended<br>October 16, 2022 | 6. Office<br>EPT/EPS |

| | | |
|---|---|---|
| 7. Birth Date<br>01/17/1985 | 8. Birth Place<br>ECUADOR, ECUADOR |  |
| 9. Sex<br>☒ Male ☐ Female | 10. OSC/WA Served<br>☒ Yes ☐ No (Explain) | |
| 11. File Number<br>A246 148 558 | 12. Bond<br>$ Date Posted | |
| 13. CINS<br>☐ Yes ☒ No | 14 Medical Alert ☐ No ☐ Yes (Explain) | 14A. |

| 15. TRANSFER DATE | FROM | TO |
|---|---|---|
| A | | |
| B | | |
| C | | |

| | | | |
|---|---|---|---|
| 16. ADMITTED BY: | 19. RELEASED TO: ☐ V/R ☐ Deport | 22. Rt. Index Print – In | 23. Rt. Index Print - Out |
| 17. SEARCHED IN BY: | 20. RELEASED BY: |  | |
| 18. DATE ADMITTED: | 21. DATE RELEASED: | | |
| 24. Remarks: See I-831 | | | |

FORM I-385 (08/01/07) ALIEN BOOKING RECORD
UNITED STATES DEPARTMENT OF HOMELAND SECURITY

You are required to retain this permit in your possession and to surrender it to the transportation line at the time of your departure unless you depart over the land border of the United States in which case you must surrender it to a Canadian immigration officer on the Canadian border, or to a United States Immigration officer of the Mexican border.

**DEPARTURE RECORD**

**Port:**

**Date:**

U.S. DEPARTMENT OF HOMELAND SECURITY
PAROLED
Until 12/19/22
Purpose: 212 (d)(5)
91016
10/17/22 EPT H.F. X-202
(Date) (Location) (Officer)
U.S. DEPARTMENT OF HOMELAND SECURITY

**Manner:**

**Country of Destination :**

UNITED STATES DEPARTMENT OF HOMELAND SECURITY

Form Approved OMB No. 43-R0496

ARRIVAL - DEPARTURE RECORD

Form I-94 (Rev. 08/01/07)

# EXHIBIT B

Under penalty of perjury, I, **Edgar Giovanny Manobanda Aroca**, declare the following:

1. My name is Edgar Giovanny Manobanda Aroca.
2. I have lived in Long Beach, CA since October of 2022.
3. I was detained by ICE on August 27, 2026, at my ICE appointment in Los Angeles, CA.
4. I do not have any criminal history.
5. I received parole from DHS on October 17, 2022.
6. I complied with all the requirements of my release. I never missed an ICE appointment or immigration court hearing, I followed every reporting instruction, and I submitted my asylum application.

_______[SIGNATURE]_________ ___09/03/2026___
Edgar Giovanny Manobanda Aroca Date

**CERTIFICATION OF TRANSLATION**

I, Boden Samuel Stringer, under penalty of perjury, state that I am competent to translate from Spanish to English and certify that the translation of this declaration is true and correct to the best of my abilities. Executed in Los Angeles, California on __09/03/2026__.

Boden
Signature ___09/03/2026___
Date

Boden Samuel Stringer
2533 W 3rd St, Studio 101, Los Angeles, CA 90057
213-201-8768

Bajo pena de perjurio, yo, **Edgar Giovanny Manobanda Aroca**, declaro lo siguiente:

1. Mi nombre es Edgar Giovanny Manobanda Aroca.
2. He vivido en Long Beach, CA desde octubre de 2022.
3. Fui detenido por ICE el 27 de augusto de 2026 en mi cita con ICE en Los Angeles, CA.
4. No tengo antecedentes penales.
5. Recibí libertad condicional del DHS el 17 de octubre de 2022.
6. Cumplí con todos los requisitos de mi liberación. Nunca fallé una cita con ICE o audiencia de corte de inmigración, seguí todas las instrucciones de informes y presenté mi solicitud de asilo.

______________________________ ____09/03/2026____

Edgar Giovanny Manobanda Aroca Date

## XII. VERIFICATION PURSUANT TO 28 U.S.C. 2242

I am submitting this verification on behalf of the Petitioner because I am Petitioner's attorney. I have discussed with the Petitioner the events described in the Petition. Based on those discussions, I hereby verify that the factual statements made in the attached Petition for Writ of Habeas Corpus are true and correct to the best of my knowledge.

Executed on September 3, 2026, in Los Angeles, California.

*/s/ Christopher Duran*
Christopher Duran
Attorney for Petitioner

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 3, 2026, I served a copy of this Petition for Writ of Habeas Corpus by email to the following individual:

Daniel Beck
Chief of the Civil Division
U.S. Attorney's Office
300 N. Los Angeles St. Ste 7516
Los Angeles, CA 90012-3341
Email: Daniel.Beck@usdoj.gov

*/s/ Christopher Duran*
Christopher Duran
Attorney for Petitioner